THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE RAINGE *et al*, Defendants-Appellants.

First District (1st Division)   No. 79—565

Opinion filed February 22, 1983.

Ralph Ruebner, Steven Clark, Martin Carlson, and Richard E. Cunningham, all of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joel A. Stein, and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Willie Rainge was convicted of the murders and aggravated kidnapings of Lawrence Lionberg and Carol Schmal and the rape of Ms. Schmal and was sentenced to concurrent terms of natural life imprisonment for each of the murders, 60 years for each of the aggravated kidnapings and 60 years for rape. Defendant Kenneth Adams was convicted of the murders of Lionberg and Schmal and the rape of Ms. Schmal and was sentenced to concurrent terms of 75 years for each of the murders and 60 years for rape.

On appeal, we are presented with seventeen issues which are raised by one of the defendants alone or by both defendants. Defendant Rainge alone raises the following issues: (1) whether the evidence established his guilt beyond a reasonable doubt; (2) whether he was denied his right to effective assistance of counsel; (3) whether he was denied his right to a public trial by the trial court's exclusion of the press and general public from the courtroom during the testimony of a rebuttal witness for the State; (4) whether he was denied his right to a fair trial by the State's failure to inform defense counsel of the existence of a rebuttal witness until shortly before the witness was called to testify; (5) whether he was denied effective assistance of counsel at the sentencing hearing through counsel's failure to advise Paula Gray, a codefendant, to invoke her fifth amendment rights and thereby preclude the State from using her out-of-court statements as evidence in aggravation against him; (6) whether the statute authorizing a sentence of natural life imprisonment violates article I, section 11, of the Illinois Constitution of 1970; (7) whether the trial court erred in its reliance upon the hearsay statement of Paula Gray, a codefendant, in determining his sentence; and (8) whether the sentences imposed for the aggravated kidnapings exceed the maximum authorized term.

Defendant Adams alone raises the following issues: (9) whether the evidence was sufficient to establish his guilt beyond a reasonable doubt; (10) whether the trial court erred in its instruction of the jury on circumstantial evidence; and (11) whether the sentences imposed upon him violate the constitutionally mandated objective of restora-

tion to useful citizenship.

Both defendants Rainge and Adams raise the following issues: (12) whether they were denied their right to a fair trial when they were tried simultaneously before two juries with Paul Gray, a codefendant accused of the same crimes as defendant herein; (13) whether the admission of hearsay testimony concerning hair sample comparisons by an expert witness, coupled with the State's comments on this testimony during closing argument, was "plain error" which denied defendants a fair determination of their guilt or innocence; (14) whether the trial court erred in its failure to conduct a full hearing concerning the existence of a prior written statement allegedly made by a witness for the State; (15) whether the trial court erred in permitting the jury to view the crime scene and in instructing the jury to consider the view as evidence; (16) whether they were denied their right to a fair trial by the State's closing argument; and (17) whether the trial court erred in sentencing defendants to extended terms where neither defendant had previously been convicted of a felony.

The record discloses that on May 11, 1978, Carol Schmal was visiting her boyfriend, Lawrence Lionberg, at a gas station in Homewood, Illinois, where Lionberg was employed. At approximately 2:15 a.m., two friends of Lionberg and Schmal left the gas station after visiting with them for about 30 minutes. The manager of the station testified that he arrived at the station at approximately 6:30 a.m., and found it unattended and in a state of disarray. At about 8 a.m., Investigator Patrick Pastirik of the Cook County Sheriff's Police arrived at the scene in response to the manager's call. At the time he arrived, a uniformed officer was present. Pastirik stated that he and other investigators who also had arrived searched the station and the surrounding area and did not find anything. Subsequently, Pastirik searched an automobile which was parked in front of the station and discovered a purse on the front seat. Upon examination of the purse contents, Pastirik found a driver's license issued to Carol Schmal. Pastirik went to the Schmal residence and spoke with Ms. Schmal's father who told Pastirik that he had last seen his daughter the previous evening with Lionberg. For the remainder of the day, Pastirik and his partner spoke with friends and relatives of the couple in an attempt to ascertain information about what might have happened to them.

Charles McCraney, a jazz guitarist, testified that in the early morning hours of May 11, 1978, he was composing music and playing his guitar in the downstairs living room of his townhouse at 1533 Hammond Lane. McCraney stated that the back of the townhouse

faced Hammond Lane and that the front of his home overlooked a courtyard between his building and the buildings on Cannon Lane. McCraney stated that he periodically would go upstairs and look out the back window to observe his automobile because he was afraid that the car might be vandalized or stolen. McCraney testified that there were no lights on in the upstairs floor of his home and he could see into the area of Hammond Lane because the area near the building was lit and there was a street light.

At approximately 3 a.m., as McCraney was checking his automobile, he saw a red Toyota which had rear-end damage and black racing stripes and which was driven by Dennis Williams pull up and back into a position next to defendant Kenneth Adams' beige Toyota. Adams' vehicle and a blue Chevrolet were parked in front of the Gray residence which was four doors west from McCraney's home. McCraney stated that he had seen the two Toyotas in the area during the day and night for the two weeks that he had resided on Hammond Lane. Approximately 10 to 15 minutes later, McCraney went upstairs to check on his automobile and observed a yellow Vega which was operated by defendant Willie Rainge "[come] in like a low-flying jet" and pull up to the side of the red Toyota. McCraney stated that he also had seen the yellow Vega in the area during the prior two weeks. After a few minutes McCraney observed the red Toyota pull away from the parking space and stop under a streetlight on Hammond Lane. McCraney stated that Williams got out and broke the light with a rock. He stated that Williams then drove the car into a parking space which was next to Rainge's Vega. He testified that he saw Rainge leave his automobile and enter the red Toyota which was then driven away east on Hammond Lane.

McCraney stated that he went to check his automobile and observed Paula Gray and another sitting in the blue Chevrolet which was parked in front of the Gray residence. Upon returning to his townhouse, McCraney heard the sound of a car which was stuck in the mud on Cannon Lane. McCraney went upstairs and saw Williams' red Toyota stuck in the mud in the gangway next to the building at 1528 Cannon Lane. McCraney testified that he then went to the window that overlooked Hammond Lane and saw the driver and three persons, one of whom he identified as defendant Adams, exit the beige Toyota and run through a gangway and an abandoned townhouse to Cannon Lane. McCraney then relocated so that he could view the buildings on Cannon Lane and the courtyard and saw the group which had run from Hammond Lane to Cannon Lane join the group which had exited the red Toyota which since had been freed

from the mud. He stated that this group of six to eight people entered the building at 1528 Cannon Lane from the courtyard entrance. McCraney testified that he recognized defendants Rainge, Adams and Williams as three of those who entered the building. McCraney stated that he did not see any members of this group during the remainder of the early morning hours. Approximately an hour and a half later, McCraney heard a gunshot from the direction of 1528 Cannon Lane. McCraney stated that the shot had been fired indoors because of the echo. He testified that he took no action after he heard the shot because it was commonplace to hear guns being fired in the area.

On cross-examination, McCraney stated that he did not see any white persons or females among the group that entered the building at 1528 Cannon Lane. McCraney testified that the only person that he would positively identify as one of the persons who entered the building at 1528 Cannon Lane was Dennis Williams. He also stated that the last time he positively could state that he saw defendant Adams was when he saw Adams exit the car and run toward the building.

Later that morning, McCraney stated that while he was talking to the janitor outside his building, he saw Williams drive up in the red Toyota, stop under the light that Williams had broken earlier and kick the glass from the street. He stated that Williams then parked his car in front of the Gray residence.

On the morning of May 12, 1978, McCraney stated that he was speaking with the janitor of the building when a neighborhood woman screamed at the janitor that their children had found a dead man. McCraney followed the woman and saw a man lying face down. He stated that the janitor called the police.

On the morning of May 12, 1978, Lieutenant Howard Vanick of the Cook County sheriff's police left his office in response to a call that a body had been found in a field near a creek in the 1500 block of Cannon Lane in East Chicago Heights. Upon arriving at the scene, Vanick approached the area where people had gathered and discovered the body of Lawrence Lionberg. A search of the area was conducted and, at approximately 12 p.m., the body of Carol Schmal was discovered in a vacant second floor apartment at 1528 Cannon Lane. Ms. Schmal's body was naked from the waist down. Dr. Stein, the chief medical examiner of Cook County, testified that he performed autopsies on the bodies the following day and determined that Lionberg died of two bullet wounds to the head and also a bullet wound to the back which had penetrated the heart. Stein testified that Ms. Schmal died from two bullet wounds to the head. He stated that, from the appearance of the bullet entry wounds on Ms. Schmal, the gun

which had fired the bullets had been six to 12 inches from her head.

Charles McCraney, who was one of the onlookers near the field, overheard Dennis Williams talking to his friends prior to the discovery of Ms. Schmal's body. McCraney testified that he heard Williams ask his friend if he shot those people. He also stated that Williams said that he saw them jump when he shot them. Shortly after McCraney heard this conversation, he testified that the body of Carol Schmal was found at 1528 Cannon Lane. McCraney testified that he "put two and two together" and telephoned the Cook County Sheriff's Police from a nearby gas station. McCraney stated that he told the dispatcher that the persons who had committed the crimes were at the scene and provided descriptions of the vehicles involved: a beige Toyota, a red Toyota and a yellow Vega. McCraney did not disclose his name at this time. McCraney returned and did not see the police acting on his information. McCraney made a second telephone call to the sheriff's police and reiterated the information which he previously had given and he also gave the license number for the beige Toyota.

At approximately 1 p.m., Investigator Pastirik who earlier had arrived on the scene received a radio message concerning the information contained in McCraney's anonymous telephone calls. Pastirik stated that he and a few other officers walked toward the crowd and were looking for a Toyota and its occupants. As he approached the group, he stated that he observed two black males walking briskly around a building on Cannon Lane. As the officers approached, one of the men, Verneal Jimmerson, saw that they were being followed and broke into a slow trot. Dennis Williams, the other man with Jimmerson, had keys in his hand and was beginning to open the car when Pastirik identified himself. After a conversation with Williams, Pastirik arranged to have the vehicle towed to the Homewood branch of the Cook County Sheriff's Police. Williams and Jimmerson were transported to the station where they were interviewed. At about 6 or 7 p.m., defendant Kenneth Adams drove his beige Toyota to the station after he had spoken with a police officer. At about 8 p.m., defendant Willie Rainge arrived at the station. After being interviewed, defendants Adams and Rainge were permitted to leave, although Adams' vehicle was kept at the station.

The following morning, Charles McCraney spoke with Pastirik and his partner at the Homewood branch of the sheriff's police. McCraney was taken to the area where Williams' red Toyota and Adams' beige Toyota were parked. Upon seeing the vehicles, McCraney stated: "You got two of the cars. You got them."

On May 14, two persons from the evidence technicians section of

the sheriff's police examined Williams' Toyota. Hair fibers were removed from the trunk of the vehicle and trace material was recovered from the passenger and rear seat areas. Michael Podlecki, a forensic scientist, testified that he examined the material recovered from the red Toyota and compared it with hair taken from the bodies of Lionberg and Schmal. Podlecki stated that under a 500-power magnification, he was not able to find any dissimilarities between the hair taken from the body of Carol Schmal and the hair recovered in the trunk of the vehicle and with a hair found on the rear floor of the car.

Podlecki stated that he also analyzed a smear slide of the vaginal area of Carol Schmal. He stated that the slide revealed "intact" sperm cells. He stated that sperm cells will remain "intact" and then begin to degenerate after 24 to 36 hours. He stated that the examination of a vaginal swab and material recovered from Ms. Schmal's pants revealed the presence of seminal fluid. He testified that analysis revealed the presence of blood types O and A in the substance. Podlecki stated that this result can be due to a combination of type A and type O seminal substances, a combination of group A seminal fluid and group O from the victim's vaginal secretions or seminal material from an individual with blood type A with a slight H blood factor.

Upon analysis of the defendants' blood and saliva samples, Podlecki stated that Dennis Williams had type A blood, defendant Rainge had type O blood and defendant Adams had type A blood with a slight H blood factor. Podlecki stated that the reason that he could determine blood types from the seminal fluid was that all three of these men were "secretors" which meant that the antigens which are responsible for determination of blood type are secreted in the bodily fluids.

The jury also heard testimony from David Jackson who was in a Cook County jail intake cell with defendants. Jackson stated that he heard Williams say that he had intercourse the night before and that Rainge responded, "Yeah, me too, you know," and that they should not have taken it from the lady. Jackson stated that Williams said that they were glad that they took care of the guy and "popped him in the head" because he just kept "running off at the mouth." Williams told Rainge that they "didn't have to worry about nothing because they would never find the pistol." According to Jackson, Williams also told Rainge that "he would have someone take care of the woman who saw them in the car and told the police about it." Jackson stated that defendant Adams was not a party to the conversation between defendant Rainge and Williams.

Defendant Willie Rainge testified that on the evening of May 10, he was at home with his girlfriend. He stated that at approximately 3 or 4 a.m., on May 11, he took his girlfriend to her home and then returned to his home. The testimony of Rainge's girlfriend substantially duplicated this testimony. He stated that at the time he arrived home, it was nearly time to go to work so he lay across the bed in his clothes until his sister woke him. Rainge testified that on May 11, he worked from 9 a.m. until 7 p.m. and that after work he did not know what he had done although he stated that he travelled the neighborhood back and forth between the houses of two girlfriends. Rainge stated on the following day he had worked and after work he was with his girlfriend when the police arrived. He testified that he was taken to the police station, questioned and released. Rainge stated that on May 13, the police requested that he drive his yellow Vega to the police station. Later that evening, Rainge was placed under arrest.

According to Rainge, he did not own a weapon. He stated that he has never seen Lawrence Lionberg or Carol Schmal, that he never has been in the area where the bodies were found and that he was not at 1528 Cannon Lane. Rainge told the jury that in the early morning hours of May 11, he did not see Williams, defendant Adams or Paula Gray. Rainge also denied having seen David Jackson in the intake cell and also denied the conversation with Williams at the jail.

In rebuttal to Rainge's testimony, the State offered the testimony of an 11-year-old boy who was one of the children who discovered Lionberg's body on May 12. After being qualified, this witness stated that in the late afternoon of May 11, he was playing with two others near the area of 1528 Cannon Lane. He stated that he saw defendant Rainge running from a building in the area of 1528 Cannon Lane. The witness testified that he saw Rainge stop at a fire hydrant, turn around and then run up a hill toward the creek. He stated that he had an opportunity to observe Rainge's face and subsequently identified Rainge from photographs shown to him by the police. The boy also identified defendant Rainge in court.

Dennis Williams who was also tried with defendants Rainge and Adams testified that he saw defendant Rainge three or four times during the day of May 11 at the Williams' home. Williams denied that he saw David Jackson in the Cook County Jail intake cell and also denied that the conversation recounted by Jackson occurred. Williams stated that on the evening of May 10, he had driven Verneal Jimmerson to the Jimmerson residence on the north side of Chicago. He stated that he arrived in East Chicago Heights at approximately

12:40 a.m. on May 11 and went to the Gray home at 1525 Hammond Lane. He testified that he parked his car next to the vehicle in which defendant Adams and Paula Gray were sitting. Williams stated that the street light across from Charles McCraney's home was out, although this testimony contradicted Williams' statement at an earlier hearing. According to Williams, he spent a short time talking to Adams and Gray and proceeded to his home at 12:45 a.m. Williams testified that he arrived home at about 1 a.m. and went to bed approximately one-half hour later.

Dennis Williams stated that he arose at about 9 a.m. on the morning of May 11 and then went to Hammond Lane where he met others who were cleaning and washing their cars. He testified that he was a friend of the Gray family and that he was at the Gray home every day. He also stated that defendant Adams also saw the Gray family, although Adams primarily associated with Paul Gray.

Williams stated that on May 12, he was with defendant Adams and Verneal Jimmerson at the scene of the homicide investigation. He recalled that Jimmerson had gone to Williams' Toyota to get a pair of sunglasses and was arrested by the police. When Williams arrived at the car, he said that the police also arrested him. Williams stated that when he was questioned by the police, he denied having any knowledge of the homicides. Williams claimed that he was not familiar with the area near the service station where Lionberg had worked. He also stated that he had never been in the building located at 1528 Cannon Lane.

The mother of defendant Kenneth Adams testified that on May 10, 1978, she lived with 11 of her 14 children in East Chicago Heights. She said that she went to bed at approximately 11:30 p.m. and woke at about 3:30 a.m. on May 11. She stated that defendant Adams was asleep in front of the television and that his Toyota was parked in front of the house. She stated that Adams had come home while she had been sleeping. According to Adams' mother, she then went back to sleep. She stated that she awoke defendant at about 9 a.m. in the morning.

Following closing arguments, the jury was instructed by the court and then retired to consider the evidence. The jury returned verdicts finding defendant Willie Rainge and Dennis Williams guilty of the aggravated kidnapings and murders of Lawrence Lionberg and Carol Schmal and guilty of the rape of Carol Schmal. The jury found defendant Kenneth Adams guilty of the murders of Lionberg and Schmal and guilty of the rape of Ms. Schmal. The State informed the court that it intended to seek the death penalty for Williams, Adams

and Rainge. Adams elected to be sentenced by the court and the other two elected to be sentenced by a jury. It was agreed that the sentencing would be heard by a different jury and that the hearing would be conducted in two phases. The first stage would involve the determination as to whether the statutory factors which would warrant the imposition of the death penalty existed and the second stage would involve whether the death penalty was to be imposed.

During the first stage of the sentencing hearing, Lieutenant Vanick, Investigator Pastirik and Dr. Robert Stein testified to matters covered in their testimony at trial. The State also called the foreman of the jury who stated that the jury heard the evidence, deliberated and returned guilty verdicts against the defendants. The signed verdict forms were admitted into evidence and the parties stipulated that on May 11, 1978, Dennis Williams was 21 years old and defendant Rainge was 20 years old. After closing arguments and instructions from the court, the jury found that Rainge and Williams were over 18 years of age at the time the murders were committed and that each had been convicted of murdering two or more persons pursuant to section 9—1(b)(3) of the Criminal Code of 1961. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3).

In the second phase of the sentencing hearing, the State called Investigator Pastirik to testify. Pastirik stated that on May 13, 1978, he saw Paula Gray at the Homewood branch of the sheriff's police. Counsel for the defense objected and during a conference in chambers argued against the admission of any testimony concerning Paula Gray's out-of-court statement. The court agreed with the State's position that under the death penalty statute the rules of evidence applicable at trial do not apply and that hearsay testimony was admissible. Pastirik recounted Paula Gray's statements which indicated that Dennis Williams was the person who shot Lionberg and Schmal. Gray told Pastirik on the morning of May 11, she was sitting in defendant Adams' vehicle when they saw a group of men trying to push a red Toyota out of some mud. She stated to Pastirik that Williams took a white man and woman from the car and directed them to an abandoned building at 1528 Cannon Lane. She told Pastirik that Williams, Verneal Jimmerson and defendant Rainge had intercourse with the woman twice and that defendant Adams had intercourse with the woman once. She stated to Pastirik that Williams then rolled the woman on her stomach and fired two shots into her head. Pastirik stated that she told him that the man was taken to a nearby field where Williams shot the man twice in the head and defendant Rainge shot him once in the back. According to Pastirik, she told him that

Williams threw the weapon into the creek which ran near the field. She also stated that Williams told her that if she told anyone about the foregoing, he would kill her and her family. Pastirik stated that Gray related this version of the events of May 11 to a grand jury. He stated that Gray testified during a preliminary hearing and told the court that the story which she told the police was a lie and that, as a result, Gray was indicted for perjury and murder.

The State offered the testimony of Ernest DiBenedetto, an Assistant State's Attorney, who stated that he took a statement from Paula Gray on May 14. DiBenedetto's testimony concerning Paula Gray's statement paralleled the testimony of Pastirik. The State's final witness was Shirley Thompson who testified that she was the court reporter when Paula Gray was questioned before the grand jury. She read the contents of Gray's grand jury testimony to the jury.[1] Certified copies of Dennis Williams' pleas of guilty to theft and arson in 1976 were admitted and read to the jury. The State then rested.

The defense in mitigation offered the testimony of Paulette Gray, Paula Gray's sister. Paulette stated that she was not told of the incidents of May 11 by her sister. She denied making any statements to the police concerning her knowledge of the events and the involvement of her sister. Louise Gray, the mother of Paula and Paulette Gray, testified that she was at the police station where she told Paula to tell the truth. She stated that she did not know what Paula had told the police. Mrs. Gray also stated that Paula had testified before the grand jury.

The defense offered the testimony of Father James Bresnahan and, on motion of the State, the court excluded the testimony because it found the testimony to be irrelevant. Paula Gray, who was tried before a separate jury, testified that the police forced her to make up a lie and that she told her mother and sister about the murders because the police made her tell a lie. She stated that Williams, Jimmerson, Adams and Rainge did not do anything and that she did not know anything. Counsel asked Paula Gray to tell the jury the lie that she was forced to tell and she recounted the events in much the same fashion as her grand jury testimony. On re-cross-examination, Paula stated that she was offered $50 to tell who was involved in the murders.

Mrs. Lula Mae Williams, the mother of Dennis Williams, stated that she woke up about 2:30 a.m. on May 11, 1978. She stated that

---

[1]For a more detailed account of Gray's statements and testimony, see *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

she assumed Williams was home because the light was on in his bedroom. After May 11, Mrs. Williams stated that she took the Gray family into her home and Paula Gray was living there until she was arrested.. Georgia Beamon, the mother of the defendant Willie Rainge, testified that on the morning of May 11 at about 1 a.m., Rainge was at home with his girlfriend. She stated that he took his girlfriend home at 2:45 a.m. and then returned. She stated that Rainge and Williams had been friends for about eight years. The defendants introduced a memorandum prepared by Ernest DiBenedetto, an assistant State's Attorney. DiBenedetto's memorandum related that he had spoken with defendant Adams and that Adams stated that when Dennis Williams arrived at the Gray home at 1 a.m. on May 11, he may have heard a pounding noise emanating from the trunk of Williams' vehicle, but that he was not sure. In a statement made to a court reporter at a later time, Adams failed to mention this pounding noise. DiBenedetto's memorandum stated that the three statements taken from defendant Rainge were substantially the same as those made by Adams. Dennis Williams concluded the defense's evidence in mitigation. Williams recounted his prior criminal record and denied any involvement in the crimes. Williams' testimony was essentially similar to his trial testimony.

The State then presented three witnesses in rebuttal. Walter Shirk, the ballistics expert who testified at trial, stated that tests determined that the bullet fragments recovered from the bodies of Lionberg and Schmal had been fired from the same weapon. Michael Podlecki gave testimony which was similar to his testimony at trial. Finally, Charles McCraney's testimony was similar to the testimony that he had given at trial. Following closing arguments, the jury retired to deliberate. The jury concluded that as to Williams and defendant Rainge that there were no mitigating factors to preclude the imposition of the death penalty. However, the jury was not able to agree unanimously that defendant Rainge should be sentenced to death.

After imposing the death sentence on Dennis Williams based upon the unanimous findings of the sentencing jury, the court heard argument in aggravation and mitigation. The court found that the murders of Lionberg and Schmal were accompanied by "exceptionally brutal and heinous behavior, indicative of wanton cruelty" and sentenced defendant Willie Rainge to natural life imprisonment. With respect to the rape and aggravated kidnapings, the court made similar findings and sentenced Rainge to concurrent extended terms of 60 years for each of the crimes.

In a separate sentencing hearing for defendant Kenneth Adams,

the court heard arguments in aggravation and mitigation. The court found that Adams was a first offender and was employed. The court noted that Adams was convicted under an accountability theory and that he declined to rape the woman a second time. The court also found that Adams' conduct was sufficient to warrant the imposition of an extended term, and it sentenced him to 75 years for the murders and 60 years for the rape.

Dennis Williams, Willie Rainge, Kenneth Adams and Paula Gray were tried for, *inter alia,* the murders of Lawrence Lionberg and Carol Schmal. Since some of the evidence which implicated Paula Gray was inadmissible against the male defendants, the trial court employed a dual jury procedure whereby the male defendants were tried by one jury and Paula Gray was tried by a second jury. At trial, Williams, Rainge and Gray were represented by Archie Benjamin Weston and Adams was represented by James Creswell. All four defendants were convicted of the two murders. Williams was sentenced to death and an automatic appeal was taken directly to the Illinois Supreme Court pursuant to the State constitution and Supreme Court Rules 603 and 606. (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603, 606.) The conviction of Paula Gray was affirmed in *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

Our decision in the instant appeal involving defendants Rainge and Adams was held in abeyance pending the decision of Williams' appeal by the supreme court because numerous issues raised in the supreme court by Williams were common issues based upon the same record which were raised in the instant appeal by Rainge and Adams. On April 16, 1982, the Illinois Supreme Court filed its opinion in *People v. Williams* (Apr. 16, 1980), No. 51870 *(Williams I),* which opinion was relied upon by this court in our disposition of numerous issues raised by Rainge and Adams. We affirmed the convictions of both defendants. On May 7, 1982, Williams filed a petition for rehearing in the supreme court. During the pendency of Williams' petition for rehearing, the supreme court considered a disciplinary matter involving Archie Benjamin Weston, the attorney who represented Williams, Rainge and Gray. *(In re Weston* (1982), 92 Ill. 2d 431, 442 N.E.2d 236.) As a result of the new and additional information with which the supreme court was presented during the disciplinary matter, the supreme court granted rehearing in *Williams.* On November 18, 1982, the supreme court issued its opinion upon rehearing in *Williams* in which it held that the evidence was sufficient to establish Williams' guilt beyond a reasonable doubt, but that Williams was entitled to a new trial because he had been denied his constitutional right

to effective assistance of counsel. *People v. Williams* (1982), 93 Ill. 2d 309. (*Williams II*).[2]

In the instant appeal, defendants Rainge and Adams have filed a petition for rehearing. In their petition, defendants allege the same grounds for rehearing which they claim were urged by Dennis Williams in the supreme court. According to defendants, Williams' petition sought rehearing on the issues of: (1) the dual jury procedure; (2) effective assistance of counsel; and (3) the State's implication during rebuttal argument that defendants attempted to bribe and intimidate the State's chief witness. In addition, defendant Adams sought rehearing on the issue of the trial court's refusal to give to the jury the second paragraph of Illinois Pattern Jury Instructions, Criminal, No. 3.02 (1968) (hereinafter cited as IPI Criminal), which instruction concerns circumstantial evidence. Since both Williams and Rainge were represented by Archie Benjamin Weston, it is necessary to reconsider whether Rainge was also denied his constitutional right to effective assistance of counsel in light of the supreme court's opinion in *Williams II*.

## I

Both defendants Rainge and Adams contend that the evidence fails to establish their guilt beyond a reasonable doubt. (Issues Nos. 1 and 9.) A court of review will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that a reasonable doubt of a defendant's guilt remains. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) Resolution of factual issues and issues of credibility are to be determined by the jury. (*People v. Lewis.*) Although the evidence against defendants was partially circumstantial, a conviction will not be reversed if the evidence tends to result in a reasonable and moral certainty that defendants committed the murders. (See *People v. Williams* (1977), 66 Ill. 2d 478, 363 N.E.2d 801.) Additionally, the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish the guilt of a defendant, but it is sufficient if the evidence, when considered as a whole, satisfies the jury beyond a reasonable doubt of a defendant's guilt. (See *People v. Williams; People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770.) We have carefully re-

---

[2]Following the decision in *Williams II*, the Illinois Supreme Court denied, without prejudice to Paula Gray to file a petition for post-conviction relief in the trial court, her motion for the issuance of a supervisory order or, in the alternative, for reconsideration of the order denying her petition for leave to appeal. *People v. Gray* (Nov. 24, 1982), No. 53953.

viewed the arguments and examined the record and we do not believe that the evidence failed to establish the guilt of defendants Rainge and Adams beyond a reasonable doubt.

## II

Defendant Rainge contends that the supreme court's decision in *Williams II* is controlling on the issue of whether he received effective assistance of counsel and, therefore, requires that he be granted a new trial (Issue No. 2). He argues that the same factors which led the supreme court to conclude that Dennis Williams did not receive effective assistance of counsel are equally applicable to the instant appeal.

The State maintains that *Williams II* is not dispositive on the issue of whether defendant Rainge received effective assistance of counsel. The State's argument is three-fold: first, the Illinois Supreme Court reversed Dennis Williams' conviction only because he was sentenced to death; second, the principal reason for granting Williams a new trial was because Archie Benjamin Weston failed to file a motion to suppress physical evidence from Williams' automobile, which motion could not be made on Rainge's behalf because Rainge lacked standing; and third, the evidence presented in *In re Weston* (1982), 92 Ill. 2d 431, 442 N.E.2d 236, should not be considered by this court because it is not of record and is also unreliable. The State argues that the differences between this appeal and Williams' case preclude that application of a special rule of law as set forth in *Williams II* to the instant appeal.

At the outset, we note that it appears that the supreme court in *Williams II* considered the State's contention concerning matters *dehors* the record. In *Williams II*, the supreme court concluded that fundamental fairness required an examination of the additional information concerning Archie Benjamin Weston to determine whether the additional information had any bearing on the supreme court's prior evaluation of the quality of representation provided by Weston. (93 Ill. 2d 309, 314-15.) Since the supreme court deemed it necessary to consider the Williams' appeal in light of the additional evidence presented in *In re Weston*, the factors discussed in *Williams II* should not be ignored as the Williams' appeal and the instant case raise a common issue on the same record. Additionally, the matters raised in *In re Weston* have a direct bearing on the issue of effective assistance of counsel raised herein.

In *Williams II*, the supreme court listed the following as instances of inaction by counsel which were cited by Williams:

"*** the failure to make a motion to suppress the physical evidence seized from Williams' car—evidence which was perhaps crucial to the State's case; the failure to object to the testimony concerning the Canadian study on hair comparisons; the failure to object to prejudicial material received by Williams' jury which it is alleged was designed to insure that the jurors would know that Paula Gray had accused her codefendants; the failure to object to the rebuttal testimony of the 11-year-old boy; the failure to object to the information imparted to the jury concerning the manner in which its verdict would be reviewed; the failure to object to testimony concerning the good character of the decedents; the failure to demand a full evidentiary hearing for the purpose of discovering the existence of a written statement allegedly made by Charles McCraney within a few days of the murder; and the failure to make a motion for a new trial." (93 Ill. 2d 309, 324.)

All of the foregoing are claimed by defendant Rainge to be equally applicable to the instant appeal with the exception of counsel's failure to move to suppress the evidence seized from Williams' car, which motion defendant Rainge could not make because he lacked standing to contest the seizure. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.) In its analysis of this issue, the supreme court stated:

"However, we are now aware, for the first time, of the unique circumstances under which counsel in this case was operating at the time of the capital trial. In light of these facts, we can no longer characterize counsel's decision not to make the motion to suppress the hair evidence or to take other action on his client's behalf as professional misjudgments made with full knowledge of the applicable law and facts. Moreover, while we do not believe that the burden of defending three clients for capital murder before two juries, standing alone, necessarily reduced counsel's effectiveness, that fact in view of the new information now before us cannot be disregarded. In our original opinion we noted the additional burdens the simultaneous trials before separate juries placed on both the court and counsel, and for this and other reasons cautioned against their future use. That added burden, of course, accentuates the problems now posed." (93 Ill. 2d 309, 325.)

The supreme court then stated that "the unique facts of this case require that we forgo application of either of the established tests, normally applied in determining whether a defendant has been de-

prived of his constitutional right to the assistance of counsel." (93 Ill. 2d 309, 325.) Although the supreme court did not characterize Weston's performance as actual incompetence or of such a low caliber as to reduce the trial to a farce or sham, it nevertheless concluded that Williams be granted a new trial because of the "unique circumstances and sequence of events in this capital case, which will rarely, if ever, be duplicated ***." 93 Ill. 2d 309, 325.

Although the State relies heavily upon the fact that Dennis Williams received the death penalty, unlike defendant Rainge herein, we do not perceive this distinction to be controlling. In *People ex rel. Hemingway v. Elrod* (1975), 60 Ill. 2d 74, 79, 322 N.E.2d 837, 840, the supreme court stated that "a capital case is one in which the death penalty may, but need not necessarily, be inflicted." Thus, it is clear that the proceedings against both Williams and Rainge were capital cases. It was the province of the sentencing jury to determine whether the two men would receive a sentence of death, and the sentencing jury concluded that the death sentence was appropriate for Wililams, but not for Rainge. We, therefore, cannot say that this distinction warrants the application of a different analysis from that employed by the supreme court in *Williams II*. An additional argument raised by the State is that the supreme court granted Williams a new trial primarily because Weston failed to file a motion to suppress evidence seized from Williams' automobile, which motion could not have been made on Rainge's behalf. The opinion in *Williams II* failed to support the position of the State. In *Williams II*, the supreme court based its decision upon the unique circumstances under which Weston was operating at the time his three clients were on trial for capital murder before separate juries and also because the supreme court could "no longer characterize counsel's decision not to make the motion to supress the hair evidence or to take other action on [Williams'] behalf as professional misjudgments made with full knowledge of the applicable law and facts." 93 Ill. 2d 309, 325.

■ We are of the opinion that the similar interests of Williams and Rainge and the similar issue raised on the same record require that defendant Rainge be granted a new trial. As in *Williams II*, we base our decision upon "the unique circumstances and sequence of events in this capital case, which will rarely, if ever, be duplicated ***." 93 Ill. 2d 309, 325.

### III

■ Defendant Adams also maintains that the interests of justice require that we grant him a new trial because counsel for Rainge and

Williams performed in such a manner that there is a doubt as to whether Adams' conviction was independent of the verdicts reached against Williams and Rainge. Defendant Adams has not cited any authority to support his claim that he is entitled to a new trial solely on the basis of the quality of representation rendered to a codefendant by separate counsel. Additionally, defendant Adams has not called to our attention or cited any reference in the record to show how he was prejudiced by the representation afforded his codefendants by Weston so as to warrant a new trial. Accordingly, we conclude that defendant Adams is not entitled to a new trial based upon the quality of representation afforded his codefendants by Weston.

Since we have concluded that defendant Rainge is entitled to a new trial, it is not necessary to consider the remaining six issues which defendant Rainge alone has raised (Issues Nos. 3 through 8). Defendant Adams has raised nine issues either alone (Issues Nos. 9 through 11) or in conjunction with defendant Rainge (Issues Nos. 12 through 17). Since we have concluded herein that the evidence established defendant Adams' guilt beyond a reasonable doubt (Issue No. 9), we shall consider the remaining issues (Issues Nos. 10 through 17). The six issues which defendant Adams has raised in conjunction with defendant Rainge were addressed by the Illinois Supreme Court in *Williams I* (Issues Nos. 12 through 17). The discussion of these six issues by the supreme court is germane to the disposition of this appeal as it relates to defendant Adams. Additionally, it appears that the supreme court opinion in *Williams I* may be recalled and may not be readily available for review and examination. Therefore, we shall incorporate the reasoning and relevant portions of the *Williams I* opinion herein and adopt the same as the opinion of this court in our disposition of the remaining six issues which defendant Adams has raised (Issues Nos. 12 through 17).

IV

Defendant Adams contends that the trial court erred in giving a modified version of IPI Criminal No. 3.02 to the jury because the evidence against defendant Adams was entirely circumstantial (Issue No. 10). IPI Criminal No. 3.02 states:

> "Circumstantial evidence is proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all other evidence in the case in arriving at your verdict.
>
> You should not find the defendant guilty unless the facts and

circumstances proved exclude every reasonable theory of innocence."

The instruction given by the court did not include the second paragraph of the instruction, and defendant argues that since there was no direct evidence of his guilt, the trial court erred in its failure to give the entire instruction. (See *People v. French* (1978), 59 Ill. App. 3d 353, 375 N.E.2d 502; *People v. Hammers* (1976), 35 Ill. App. 3d 498, 341 N.E.2d 471, *cert. denied* (1976), 429 U.S. 1002, 50 L. Ed. 2d 614, 97 S. Ct. 534.) The State argues that IPI Criminal No. 3.02 only should be given where the evidence against defendant is entirely circumstantial. (*People v. Davis* (1981), 93 Ill. App. 3d 217, 416 N.E.2d 1197.) In addition, the State contends that in *French* and *Hammers*, which are cited by defendant, it was held that the failure to give the second paragraph of the instruction was not grounds for reversal.

■ We view defendant's contention to be without merit. The evidence against defendant was not entirely circumstantial as he claims. There was testimony from Charles McCraney concerning defendant's entry into the abandoned apartment building where the rape and murder of Carol Schmal occurred. Even assuming that McCraney's testimony was circumstantial evidence, we find no error in the court's refusal to give the second paragraph of this instruction. We are not persuaded that defendant was prejudiced in any way because of the court's failure to give the second paragraph of the instruction. Additionally, defendant elected to present his version of his whereabouts on the evening of the crimes, and we do not believe that there was a need for the jury to speculate as to other possible theories of his innocence. *People v. Davis; People v. French.*

## V

Defendant Adams argues that the imposition of extended-term sentences for the murders (75 years) and rape (60 years) violates article I, section 11, of the Illinois Constitution of 1970 (Issue No. 11). Article I, section 11, states, in pertinent part:

> "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship ***." (Ill. Const. 1970, art. I, sec. 11.)

As evidence of his rehabilitative potential, defendant points to the fact that at the time of sentencing, he was 21 years old, that he is a high school graduate; that he was employed as a maintenance worker for Sears, Roebuck & Co. for over one year; that, following his job at Sears, he was employed in a hospital and was enrolled in a CETA jobs

training program. He also cites to us that he did not have a prior criminal history and that he contributed to the support of his family with whom he lived. He contends that the sentences imposed reject the objective of rehabilitative potential because he will have to serve a minimum of 37½ years on the murder convictions and 30 years on the rape conviction before he is eligible for supervised release. Ill. Rev. Stat. 1979, ch. 38, pars. 1003—3—3(c), 1003—6—3(2).

The Illinois Supreme Court has stated that the spirit and object of the law are upheld when a sentence reflects both the seriousness of the offense and the potential for defendant's rehabilitative potential. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) The competing dictates of article 1, section 11, must be balanced and an appropriate sentence fashioned after the trial court's consideration of all relevant factors. (See *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In *People v. Gaines* (1981), 88 Ill. 2d 342, 382, 430 N.E.2d 1046, 1066, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285, the supreme court made the following observations in its consideration of the imposition of the death penalty in light of the dictates of article 1, section 11:

"The possibility of an individual offender's rehabilitation is not the sole factor to be considered in sentencing, and the court is also to consider whether the seriousness of the offense and the protection of the interests of society call for a sentence of severity. [Citations.]

Upon a conviction of murder, the alternative to a death sentence is a determinate sentence for either a term of not less than 20 and not more than 40 years or a term of natural life imprisonment. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) For this reason the legislature might reasonably have concluded that the rehabilitative potential of the offender was not a relevant factor and that the jury need not consider it."

■ The foregoing is no less relevant in the instant case. Thus, in sentencing defendant Adams, the trial court may have concluded that the seriousness of the offense and societal interests outweighed defendant's rehabilitative potential. Under the facts of this case, we cannot say that the trial court abused its discretion in sentencing defendant to terms of 75 years for the murders and 60 years for the rape in light of the brutal nature and seriousness of the offenses. See *People v Carlson; People v. Perruquet.*

## VI

■ As to the issue concerning the trial court's use of a dual jury procedure (Issue No. 12), the supreme court stated:

"Defendant first argues that the trial court was without authority to employ the dual jury procedure and that it was an ineffective remedy for the *Bruton* problem. In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court held that a confession of a codefendant was inadmissible against the other where the confessor did not take the stand because the defendant would be deprived of his constitutional right of confrontation. (391 U.S. 123, 126, 20 L. Ed. 2d 476, 479, 88 S. Ct. 1620, 1622.) Moreover, the court held that a jury instruction to disregard the hearsay evidence was insufficient to overcome the prejudice to defendant. 391 U.S. 123, 137, 20 L. Ed. 2d 476, 486, 88 S. Ct. 1620, 1628.

Following the Supreme Court's decision in *Bruton*, this court held that the admission of a confession by one codefendant implicating the other defendant was reversible error as to the other despite cautionary instructions. (*People v. Miller* (1968), 40 Ill. 2d 154.) This court noted that the State had three alternatives: not using the confession at all; trying defendants separately; or effectively deleting the inadmissible parts of the confession. 40 Ill. 2d 154, 158-59.

The State argues here that a fourth solution has developed—one trial before separate juries. (See *United States v. Rimar* (6th Cir. 1977), 558 F.2d 1271, *cert. denied* (1978), 435 U.S. 922, 55 L. Ed. 2d 515, 98 S. Ct. 1484; *United States v. Sidman* (9th Cir. 1972), 470 F.2d 1158, *cert. denied* (1973), 409 U.S. 1127, 35 L. Ed. 2d 260, 93 S. Ct. 948; *People v. Lindsey* (1979), 73 Ill. App. 3d 436.) The State maintains that this procedure is a superior alternative because it recognizes the concern for judicial economy while protecting defendant's confrontation rights as effectively as would totally separate trials. Moreover, the State urges that the defendant here suffered less prejudice than if an edited version of the confession had been admitted.

The case before us, because of the procedures used, does not present the exact problem addressed in *Bruton* and *Miller*. Defendant's contention, however, seems to be that certain testimony presented to his jury amounted to the admission of an ineffectively edited confession by codefendant Gray. Certain remarks made by the State in opening and closing arguments as well as questions asked and testimony received on direct examination of a

State witness and questions asked on cross-examination of two defendants were designed by the State, so defendant now contends, to insure that even a "slow-witted juror" would know Paula Gray had accused her codefendants. Moreover, relying on the arguments presented in *Bruton,* defendant contends that the repeated admonitions to the jury not to speculate about the testimony that they would not hear were not only ineffective but may also have highlighted and drawn the jury's attention to it.

The record indicates that Williams' jury was made aware of the following: that Paula Gray was extensively interviewed and read her *Miranda* rights by police after investigators talked to Charles McCraney; that after one of these interviews she was taken by police, at midnight, to the scene of the crime; that an interview with her was a "break" in the case for police; that two of the defendants (Rainge and Adams) were arrested soon after police had talked to her; that Paula Gray was being tried for "similar offenses"; and that there was evidence against her that they would not hear. The juries were not sequestered during the trial, but there is no indication of any impropriety on the part of either jury. The court was extremely careful in making sure that there was no contact between the two juries during the course of the trial except during the time both juries were seated and hearing evidence.

Although the Williams jury did know that Paula Gray was a principal in the case and was in some way connected to the male defendants, nothing in the record indicates that she made statements against the other defendants. However, Williams argues that the obvious conclusion to be drawn from the facts described above is the one forbidden by *Bruton* that Gray gave statements implicating the male defendants. However, the State argues that an equally plausible conclusion could be drawn that the male defendants had implicated Gray. The Williams jury knew that he had been arrested before the police talked to Gray, that Gray and her family had moved in with Williams' family after his arrest and that Williams and Adams spent considerable time at the Gray home prior to the crimes. There is room here for speculation which might lead to any one of many possible conclusions, and on this record we cannot find that the jury was apprised of the substance of Gray's statements.

In our opinion the trial court had sufficient statutory authority to order trial with two juries. Section 114—8 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—8)

gives the court authority to order causes joined or separated or to 'provide any other relief as justice may require.' While we believe that statute to be sufficient authorization, we also believe further use of this kind of trial proceeding ought not to be encouraged. The State argues that trial by two juries provides a defendant with more protections than does the admission, before one jury, of a confession with inadmissible portions excised. However, before such an edited confession is admissible it must be excised of all references or innuendo, specific or implied, which might identify a codefendant. (*People v. Miller* (1968), 40 Ill. 2d 154; *People v. Johnson* (1958), 13 Ill. 2d 619; *People v. Hodson* (1950), 406 Ill. 328.) It is the possibility that inadvertent revelations will disclose to the separate juries the inadmissible evidence which concerns us.

While we have frequently advocated considerations of expense and judicial economy, those factors will in this context usually be outweighed. In addition to the possibility of error, a single trial of multiple defendants before more than one jury creates burdensome administrative problems in caring for the juries and maintaining proper courtroom decorum. Issues and facts before each jury, who testified before which jury, and even which jury is hearing which testimony can all too easily become confused. (See, *e.g., United States v. Rimar* (6th Cir. 1977), 558 F.2d 1271, *cert. denied* (1978), 435 U.S. 922, 55 L. Ed. 2d 515, 98 S. Ct. 1484.) Too, some strain is placed on both the prosecution and defense in presenting the case in an orderly, uninterrupted fashion. While we find no reversible error here, the possibility of problems is such that we believe the use of dual juries ought to be viewed with considerable caution." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 4-7.

## VII

█ In addressing the issue concerning the admission of Canadian hair sample study and the State's comments thereon in closing arguments (Issue No. 13) the supreme court stated:

"Defendant alleges error in the admission of testimony concerning the Canadian study on hair comparisons and in that part of the State's closing argument which referred to that study. In its rebuttal argument the State said the probability of finding similar hairs from different people was 1 in 4,500, noting that in this case three hairs were found in Williams' car, two being similar to that of Carol Schmal and one to that of Larry Lionberg, and concluded, 'What are the probabilities and chances of that beyond a

reasonable doubt ladies and gentlemen of the jury, I submit to you.' Defendant relies on *United States v. Massey* (8th Cir. 1979), 594 F.2d 676, where it was held that the prosecutor's argument, based on the same study, was plain error and sufficiently prejudicial to require reversal. There, however, the testimony was elicited from the witness by questions from the bench. The prosecutor made extensive comments upon it and concluded *'that just the hair sample would be proof beyond a reasonable doubt because it is so convincing.'* 594 F.2d 676, 681.

We note that there was no objection made to this testimony on either hearsay or lack-of-foundation grounds. Thus, these objections were waived. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576.) In any event, however, we do not regard the State's argument as prejudicial error. Although statistical arguments may sufficiently mislead a jury as to require reversal, we do not have such a case here. The comments by the State were far less extensive than those made in *Massey*, and there was no claim that the hair evidence established proof beyond a reasonable doubt. The dissenting opinion in *Massey* suggests that this kind of evidence, together with statements of the probability of certain events occurring, may be legitimately considered by the jury, along with other evidence. (594 F.2d 676, 681.) There is evidence here which places Williams' car, and Williams himself, in the area where the bodies were found, and evidence which suggests that the victims were transported there by car and against their will. The study evidence was legitimately in the record and could properly be commented upon and be considered by the jury. *People v. Williams* (1968), 40 Ill. 2d 522, 528, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004; *People v. Ostrand* (1966), 35 Ill. 2d 520, 531-32; *People v. Burnett* (1963), 27 Ill. 2d 510, 517; *cf. People v. Vriner* (1978), 74 Ill. 2d 329, 342 (jury may draw reasonable inferences with evidence)." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 12-13.

## VIII

■ The supreme court next considered the issue concerning the trial court's inquiry into a written statement allegedly given to the police by the State's chief witness (Issue No. 14) as follows:

"Defendant contends that the trial court erred in not conducting a more detailed hearing on the existence of a written statement which Charles McCraney allegedly gave police within a few days of the murders. Under cross-examination by Adams' counsel,

McCraney testified that he had signed a typewritten statement given to police during one of his initial interviews with them. After a sidebar conference where both defense attorneys demanded the statement and the State denied any knowledge of it, McCraney was again asked about it, and he again testified that he had given such a statement in the presence of Officer Capelli and two other officers whose names he could not remember. (At the sentencing hearing McCraney gave the same testimony, again, and also named the other officers.) Defense demand for the statement was renewed several days later in chambers. The State informed the court that it had checked with the investigating officers and was told by them that no statement had been made. Williams' attorney asked and was granted permission to conduct further cross-examination of McCraney on the point if the State failed to produce the statement; however, McCraney was not recalled by defense counsel. The court ordered the State to produce Officer Capelli and his file. Capelli later took the stand as a defense witness, and he turned over his file to defense counsel. Capelli testified that to his knowledge no formal statement was taken from McCraney; however, Capelli said he had made a memorandum several weeks after initially talking to McCraney and defendants had been given this memorandum. Defense counsel was given an opportunity to inspect his file, and, apparently, no statement was found.

Defendant now argues that *People v. Wright* (1964), 30 Ill. 2d 519, *appeal dismissed and cert. denied* (1964), 379 U.S. 11, 13 L.Ed. 2d 24, 85 S. Ct. 133, requires the trial court to conduct, on its own motion, an inspection of the entire police file and to call all officers who were present when McCraney talked to the police. In *Wright*, this court remanded with directions that the trial court inspect police files for a statement of a witness and vacate its judgment of conviction and order a new trial only if one was found. However, there, although the prosecution denied having such statement in its possession, there was no dispute that at one time the statement did exist. Moreover, the files had been brought to court in response to a defense subpoena, but the court had denied defendant the right to inspect the entire file under *Palermo v. United States* (1959), 360 U.S. 343, 354, 3 L. Ed. 2d 1287, 1296-97, 79 S. Ct. 1217, 1225-26. Because of this denial this court held that even though defendant did not request the court to inspect the file and it would be 'technically correct' to hold that the court was under no duty to do so, such holding would be unfair to

the defendant. 30 Ill. 2d 519, 532.

In this case the existence of the statement at any time was disputed. The court cooperated with defense attorneys' efforts to examine witnesses about it, and the only identified officer to whom the witness said the statement was given was brought into court and examined by all parties. His files were made available to defendants. We are satisfied that the court, under these circumstances and in the absence of defendants' request for additional action, adequately exercised its discretion and was under no duty to inquire further into the matter. See, *e.g., People v. Moore* (1969), 42 Ill. 2d 73, 80-81, *cert. granted* (1971), 403 U.S. 953, 29 L. Ed. 2d 864, 91 S. Ct. 2280, *rev'd in pt. and rem.* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562; *cf. People v. Flowers* (1972), 51 Ill. 2d 25; *People v. Dennis* (1970), 47 Ill. 2d 120, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 15-17.

## IX

As to the issue concerning the jury's viewing the scene of the crime and the trial court's instructions thereon (Issue No. 15), the supreme court stated:

"Defendant next alleges that the trial court abused its discretion in permitting the jury to view the scene of the crime. The view was conducted during the day, for considerations of safety, over defense objections that conditions at the scene had materially changed, that a daytime view would distort the evidence, and that such a view would be evidence not subject to cross-examination. When the jury returned, the officer who had investigated the scene on May 12 was called to explain the changes in the area. These changes included the installation of flood lights on the top of the buildings, the boarding up of abandoned buildings, and an overgrowth of weeds in the field where Lionberg's body was found.

We find no abuse of the trial court's discretion in allowing the jury to view the scene of the crime. Where the testimony and evidence is such that the trial court determines that a view will aid the jury in understanding it, the court may grant a motion to allow a jury view. (*Cf. People v. Hester* (1968), 39 Ill. 2d 489, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408; and *People v. Durso* (1968), 40 Ill. 2d 242, *cert. denied* (1969), 393 U.S. 1111, 21 L. Ed. 2d 807, 89 S. Ct. 923 (where the court de-

nied the motions).) In this case, in order to evaluate McCraney's testimony, it was critical that the jury understand the nature of the area he saw. We cannot say the trial court erred in permitting the view for this purpose. Nor can we say that the defendants were prejudiced by the daylight view or the changed conditions, in view of the fact that the State put on detailed evidence to explain the nature of those changes in order to ameliorate possible prejudice.

While we do not regard the argument as meritorious, defendant urges that the trial judge erred by instructing the jury that its view could be considered as evidence; no objection thereto was made at the trial level, and it was accordingly waived. *People v. Roberts* (1979), 75 Ill. 2d 1." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 17.

## X

■ ■ In addressing the issue of whether certain remarks of the prosecutor during closing argument constituted prejudicial error (Issue No. 16), the supreme court stated:

"Defendant contends that the State's assertion in closing argument that Dennis Williams cleaned his car on May 11, thus removing any fingerprints that the victims might have left in it, was without foundation in the record. We disagree. The record indicates that Williams' car was dusted for fingerprints within a day or two of Williams' arrest and that fingerprints were found. Neither the State nor defendant produced any testimony regarding them. The record also indicates that Williams testified that at one time, a few months before May 11, he worked at a car wash. He also testified that on May 11, during the late morning hours, he worked on his car in an area where others were 'cleaning the cars, you know, sweeping it out and washing it.' In rebuttal argument the State responded to defendant's theory that the lack of fingerprint evidence indicated that the victims were never in Williams' car by arguing that Williams cleaned his car to cover up the crime. Although there was no specific evidence that Williams cleaned his car, we think that the possibility he had done so was a legitimate inference from the testimony of Williams himself. As such, it was neither improper nor prejudicial. *People v. Williams* (1968), 40 Ill. 2d 522, 528; *People v. Ostrand* (1966), 35 Ill. 2d 520, 531-32; *People v. Burnett* (1963), 27 Ill. 2d 510, 517.

Defendant, however, argues that *People v. Beier* (1963), 29 Ill. 2d 511, requires an opposite result. There this court held that it

was error for the prosecutor to comment that no fingerprints could be found because the defendant had wiped them from the gun, where was no testimony as to absence or presence of fingerprints in the record. (29 Ill. 2d 511, 516.) Controlling the decision to reverse in *Beier*, however, was a serious error in admitting an alleged dying declaration; it appears that the improper comment as to facts not in evidence would not, standing alone, have required reversal. Moreover, in this case, we find that there was evidence in the record from which an inference that Williams cleaned his car could legitimately be drawn.

Defendant contends that the State's implication in rebuttal argument that the defendants had attempted to bribe and intimidate Charles McCraney was unsupported by the evidence. The objection is to comments by the State concerning McCraney's testimony on cross-examination that someone had attempted to bribe him not to testify and that he reported this to the State's Attorney. The initial remark was: 'These men came into this hall of justice and they ask you to give justice. And what do you get from this thing. You get Esposito trying to bribe McCraney. You get McCraney with two cars gone because of sugar in it.' A discussion followed an objection that this was not in evidence. during this discussion, in the hearing of the jury, the State's Attorney said that the bribe was $700. The trial judge read the relevant parts of the transcript and ruled: 'Anyway, you can talk about an attempt to bribe, but you can't say anything about seven thousand dollars.' The State's Attorney finished his argument, again mentioning the attempted bribe and the damaged cars, but not a money figure.

The record does contain unobjected-to evidence of both an attempted bribe of McCraney and damage to his cars. McCraney testified to both. The State did not assert as fact that the defendants were responsible for either act. That the State implied defendants' responsibility for these acts or that the jury inferred defendants' responsibility for them seems to be well within the scope of permissible argument. Where a key State witness testifies to an attempted bribery or intimidation aimed at stopping his testimony, it seems eminently reasonable to imply that those against whom he is testifying, those who would gain most if he failed to testify, were responsible for the attempts. (*People v. Williams* (1968), 40 Ill. 2d 522, 528, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004; *People v. Ostrand* (1966), 35 Ill. 2d 520, 531-32; *cf. People v. Vriner* (1978), 74 Ill. 2d 329, 342.) It was, of course, improper to mention the monetary figure

since there was no evidence of any specific offer. However, in view of the fact that a bribe was in fact offered, and the judge did rule in the jury's presence that an amount could not be mentioned, we do not think that this error prejudiced defendant. *People v. Baptist* (1979), 76 Ill. 2d 19, 29; *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.

Defendant also contends that the State elicited various facts concerning the good character of the victims and in closing made a 'blatant appeal to sympathy' for them. Most of the facts complained of came in during testimony by the investigating officer who was called to the gas station, by the friend of the victims' who testified to seeing them at the station, and by Carol's mother and Larry's father, who were called as 'life and death' witnesses. Our review of this testimony satisfied us that anything irrelevant was of a minor nature and far from substantially prejudicial. (See *People v. Pittman* (1973), 55 Ill. 2d 39.) Furthermore, there were neither objections made to this testimony nor to the closing argument by the State. Any error that may have occurred has been waived. *People v. Carlson* (1980), 79 Ill. 2d 564." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 13-15.

## XI

●■ The supreme court next considered the issue of whether the imposition of extended terms was authorized by law (Issue No. 17) as follows:

"Lastly, defendant contends that the concurrent extended terms of 60 years imposed for rape and aggravated kidnaping are unauthorized by law. The State concedes and we agree that the extended sentences imposed for aggravated kidnaping were improper because they were not Class X felonies. If factors in aggravation were properly found, the maximum extended term would be 30 years rather than 60.

The relevant sections, sections 5—5—3.2(b) and 5—8—2(a) of the Unified Code of Corrections, provide:

'(b) the following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:

(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody,

and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.' Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).

Sec. 5—8—2. Extended Term.

(a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the *factors* in aggravation set forth in paragraph (b) of Section 5—5—3.2 *were found* to be present. Where the judge finds that *such factors* were present, he may sentence an offender to the following: \*\*\*' (Emphasis added.) Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—2(a).

The trial court found that the offense was of an exceptionally brutal nature and that defendant's conduct was heinous and sentenced him to extended terms. The defendant now contends that despite the use of the disjunctive in section 5—5—3.2(b), the use of the plural 'factors \*\*\* were found' in section 5—8—2(a) demands that both factors in the former section must be found.

The plain language of section 5—5—3.2(b) indicates that in both subsections (1) and (2) more than one factor must be determined. In subsection (b)(1) it must be found that a defendant is convicted of a felony, that he had been convicted within 10 years of a felony classified at least as seriously, and that that conviction arose out of a different series of acts from the one for which he is being sentenced. In subsection (b)(2) it must be found that the defendant is convicted of a felony and that the offense was of such an exceptionally brutal or heinous nature that wanton cruelty is indicated. Since, therefore, there is more than one factor to be found in either of the subsections, the use of the plural in section 5—8—2 is necessary and in harmony with the use of the disjunctive in section 5—5—3.2(b). We hold, therefore, that the extended terms for rape were properly imposed; that the extended terms for aggravated kidnaping were properly imposed but that they must be reduced to 30 years for the reasons earlier indicated." *People v. Williams* (Apr. 16, 1982), No. 51870, slip op. at 27-28.

As to defendant Rainge, "the unique circumstances and sequence of events in this capital case" require that he be granted a new trial. Accordingly, the judgments of conviction of defendant Rainge are hereby

vacated and this cause is remanded to the circuit court of Cook County for a new trial.

As to defendant Adams, the judgment of the circuit court of Cook County is hereby affirmed. Additionally, defendant Adams' petition for rehearing is denied.

McGLOON and O'CONNOR, JJ., concur.