673 P.2d 1

**STATE of Arizona, Appellee,**

v.

**Joe Leonard LAMBRIGHT, Appellant.**

No. 5594.

Supreme Court of Arizona,
In Banc.

Sept. 28, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Thomas G. Martin, Tucson, for appellant.

CAMERON, Justice.

Defendant, Joseph Leonard Lambright, was tried before a jury and convicted of first degree murder, A.R.S. § 13–1105, kidnapping, A.R.S. § 13–1304(A)(3), and sexual assault, A.R.S. § 13–1406. In addition, the kidnapping and sexual assault were found to have been dangerous felonies, involving the infliction of serious physical injury, A.R.S. § 13–604. Defendant was sentenced to death for the murder, to 21 years imprisonment for the kidnapping, and to 21 years imprisonment for the sexual assault, to be served consecutively to the sentence for kidnapping. The case was automatically appealed to this court pursuant to Rules 26.15, 31.2(b), Arizona Rules of Criminal Procedure, 17 A.R.S.; we have jurisdiction pursuant to Art. 6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13–4031 and 13–4035.

The issues we must decide on appeal are:

I. Does the use of a dual jury procedure at trial constitute reversible error?

II. Did the trial court lack venue over the homicide charge?

III. Were defendant's statements voluntary?

IV. Was it error to allow an official of the Pima County attorney's office to testify regarding the grant of immunity to an accomplice?

V. Did the trial court err in failing to give one of the defendant's proffered jury instructions?

VI. Is the Arizona death penalty statute unconstitutional?

VII. Is the statutory aggravating circumstance of killing in an "especially heinous, cruel, or depraved manner" unconstitutionally vague?

VIII. Is there a right to have a jury participate in sentencing where the death penalty is imposable?

IX. Is it unconstitutional to place the burden of proof of mitigating circumstances on the defendant?

X. Does this court find in its independent review that the death penalty was appropriate in this case?

XI. Is the death penalty in this case proportionate to the disposition of other similar cases?

The facts necessary to a determination of this appeal are as follows. In February and March, 1980, Joseph Lambright, Robert Smith, a friend of Lambright's, and Kathy Foreman, Lambright's girlfriend, took a cross country driving trip. Beginning in Texas, where they resided, they first drove to Florida, returned to Texas, and continued on to Arizona. The trip was financed with muggings or purse-snatching and some occasional work. During the trip Lambright and Foreman were sexually involved, and frequently had intercourse in Smith's presence; sometimes this occurred in the car while Smith was driving.

When the group arrived in Arizona, they camped in the mountains outside Tucson. Lambright and Foreman again engaged in intercourse in the presence of Smith, and Smith became angry. He complained that Lambright had all the sex he wanted. Lambright asked why Smith "didn't go out and find somebody." Smith said it "wasn't so easy" and began walking off. The two men then walked away together and talked for several minutes.

The next day, 11 March 1980, the three went into Tucson and were having coffee at a Hobo Joe's restaurant, when Smith once again indicated he wanted a woman. At this point Foreman left to use the restroom. As she was returning, she testified that she overheard Lambright saying to Smith that Lambright "would like to kill somebody just to see if he could do it." When Foreman inquired moments later what was going on, Lambright told her that they were going to go out and find somebody for Smith.

Lambright drove the group around Tucson for some time, and at approximately 3:30 p.m. they saw a young woman, the victim Sandy Owen, hitchhiking. They stopped and picked up the victim, who seated herself in the unoccupied back seat and said she wanted a ride to the food stamp office. They drove to the food stamp office, but when they arrived there they did not permit Ms. Owen to leave the car. Instead Lambright drove to the back of the building, got out of the car and jumped into the back seat with Ms. Owen. He told her to "shut up and be quiet and she wouldn't get hurt."

Smith got out of the front passenger's seat and into the driver's seat. He pulled the car away and began looking for the freeway. Foreman turned around and saw that the victim looked frightened, and appeared to be trembling. Foreman asked the victim how to get to the interstate. Smith told the victim to shut up, because she would not tell them the truth. They found Interstate 10, and proceeded northwest toward California. Lambright searched through the victim's purse, found a bottle of pills, and asked what they were for. The victim stated they were part of a mental therapy she was undergoing.

At some point Owen stated that she needed to use a restroom. They pulled the car off to the side of the interstate, and told her she could relieve herself behind some trees. Lambright had the victim take her shoes off so she would be unable to get away, and had Kathy Foreman accompany her to make sure she did not try to run. The group got back into the car, now with Lambright driving and Smith in the back seat. Smith put a blanket and some clothes over the rear windows, and proceeded to rape the victim. When he had finished he snickered and said she had small breasts.

The car proceeded through Pinal County, turned off the interstate, and proceeded to some isolated mountains. Ms. Owen asked if her captors were going to release her, and they told her they would take her back and let her go. They left the car at the end of a dirt road and walked part way up one of the mountains to a level area, arriving near dusk. After building a fire, Lambright and Foreman had intercourse, and a few feet away Smith again raped the victim.

Smith then began choking Ms. Owen. She collapsed, and Smith retained his grip on her as she fell. Lambright stated the woman had to be killed, or else she could press charges for kidnapping and rape. Lambright took Foreman's knife out of its sheath and began stabbing the victim in the chest and abdomen, twisting the knife around inside of her. Smith held one of the victim's arms while she was being stabbed, and Foreman held the other arm. Foreman testified that after the stabbing Smith unsuccessfully tried to break Ms. Owen's neck by twisting her head. Then Lambright, Foreman or both began cutting deeply into the victim's neck with the knife; Foreman claimed that only Lambright cut the victim's neck, Smith claimed that it was done by both Lambright and Foreman, and Lambright claimed he could not remember who used the knife during the killing. The victim remained alive, and was at least semiconscious, as she attempted to raise herself up on one arm. Lambright picked up a large rock and hurled it at her head. Foreman testified that as he threw the rock he yelled "Die, bitch."

Jewelry was taken from the victim's body, and then rocks were piled on top of her. Lambright, Smith, and Foreman returned to the car and washed the blood off their hands. As they got back into the car and began driving to San Diego, the group engaged in a macabre celebration, playing a tape of music entitled "We Are the Champions." When they arrived in San Diego, they pawned a wedding ring belonging to Ms. Foreman. They continued on to Anaheim, California, to Las Vegas, Nevada, and then returned to Texas, where they were apprehended approximately a year later after a tip to police from someone who had been told about the crime. Each of the three persons made statements to the police.

The Pima County Attorney's Office decided to charge Lambright and Smith for their participation in the crimes, and to grant immunity to Foreman in return for her testimony. Lambright and Smith were extradited to Pima County and tried for kidnapping, sexual assault, and first degree murder. The case was assigned to the Honorable Michael V. Brown of the Pima County Superior Court. In light of the defendants' confessions, which were not totally interlocking, and the appearance of potentially antagonistic defenses, Judge Brown severed the cases of Lambright and Smith. Because most of the evidence was relevant to both defendants, however, the judge decided to hold a single "dual jury" trial, in which two separate juries were empaneled, each to decide the guilt or innocence of only one defendant, and each permitted to hear only evidence admissible against that one defendant. The defendants were each convicted of first degree murder, kidnapping, and sexual assault, and both appeal their convictions and sentences. We examine Robert Smith's convictions and sentences in *State v. Smith,* filed this day, 138 Ariz. 79, 673 P.2d 17. In the instant case we consider the convictions and sentences of Joseph Lambright.

## I. DUAL JURIES

In the pre-trial stages it appeared to the trial judge that this case could present

problems under the doctrine of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* prohibits the introduction of a defendant's statements to incriminate a codefendant in a joint trial, where the declarant is unavailable for cross-examination due to the assertion of his fifth amendment right to silence. In the instant case, the state intended to use statements of both Smith and Lambright at trial, and each of these statements incriminated both the declarant and the codefendant. Moreover, although the statements were substantially "interlocking," which might have allowed their admission under the exception to *Bruton* created in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the confessions did not overlap in all respects. After considering the confessions, and finding it impractical to attempt to edit out the portions incriminating the other defendant, the trial judge decided to sever the two cases. *See* Rule 13.4, Arizona Rules of Criminal Procedure, 17 A.R.S. However, because most of the evidence was admissible against both defendants, and because the trial was expected to last over a week and included several out-of-state witnesses, rather than hold separate trials the judge decided to conduct a single trial using two juries.

Under this "dual jury" procedure, two juries were chosen from separate venires, each to decide the guilt or innocence of only one defendant. The trial was held in a courtroom in the federal courthouse in Tucson which was large enough to accommodate both juries. The two juries were kept physically separated, and were carefully instructed not to speak with persons on the other jury. When information relevant to both defendants was being presented, both juries remained in the courtroom. When evidence admissible against only one defendant was being presented, the jury for the other defendant was excused. When both juries were present, one sat in the jury box and the other sat in designated rows of chairs on the other side of the courtroom. The positions of the respective juries were alternated daily. Separate opening and closing arguments were made, each in front of one jury only. The juries were given separate instructions, and then sent to deliberate separately. When the first jury reached a verdict, it was not made public until the deliberations of the other jury had concluded. In the instant case both defendants were convicted on all counts, and each defendant assigns as error the use of the dual jury procedure.

It appears that a number of courts have approved the dual jury procedure. *See, e.g. United States v. Hayes,* 676 F.2d 1359, 1366–67 (11th Cir.), cert. denied 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982); *United States v. Rimar,* 558 F.2d 1271 (6th Cir.), cert. denied sub nom. *Rimar v. United States,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *United States v. Rowan,* 518 F.2d 685, 689–90 (6th Cir.), cert. denied sub nom. *Jackson v. United States,* 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975); *People v. Wardlow,* 118 Cal.App.3d 375, 382–387, 173 Cal.Rptr. 500, 502–05 (1981); *People v. Brooks,* 92 Mich.App. 393, 285 N.W.2d 307 (1979). These cases generally find that this procedure satisfies the defendants' constitutional rights as well as the end of judicial economy. *See also United States v. Sidman,* 470 F.2d 1158 (9th Cir.1972), cert. denied 409 U.S. 1127, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973) (holds procedure satisfies each of defendant's constitutional rights, including rights to impartial jury and due process). In addition to complying with the formal confrontational requirements of *Bruton,* the procedure may effectively avoid the "spectacle" of antagonistic defenses. *People v. Brooks,* supra, 92 Mich.App. at 396, 285 N.W.2d at 308.

Besides the courts which generally approve the dual jury procedure, there are courts which have given limited approval to the procedure, suggesting that appropriate guidelines be developed before the procedure is put into common use. *See, e.g. United States v. Sidman,* 470 F.2d 1158, 1170 (9th Cir.1972); *State v. Watson,* 397 So.2d 1337, 1342 (La.1981), cert. denied 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).

Some other courts have discouraged or disapproved of future use of the procedure, finding the risks of error inherent in the procedure too great. *See, e.g. People v. Williams* (No. 51870, filed 16 April 1982, rev'd on grounds 93 Ill.2d 309, 67 Ill.Dec. 97, 444 N.E.2d 136 (1982); *Scarborough v. State,* 50 Md.App. 276, 278–281, 437 A.2d 672, 674–76 (1981); *State v. Corsi,* 86 N.J. 172, 430 A.2d 210 (1981). The principal risk of this procedure appears to be that while both juries are present, there may be some unintentional disclosure or reference to information admissible against only one defendant which may constitute reversible error. The Illinois Supreme Court stated, "It is the possibility that inadvertent revelations will disclose to the separate juries the inadmissible evidence which concerns us." *People v. Williams,* supra, quoted in *People v. Rainge,* 112 Ill.App.3d 396, 419, 68 Ill.Dec. 87, 102, 445 N.E.2d 535, 550 (1983). This risk is demonstrated by *United States v. Sidman,* supra, in which such an error actually occurred. During trial an inadvertent *Bruton* problem arose when in the presence of both juries the prosecutor was allowed to question a witness regarding a statement of defendant Sidman which incriminated both himself and his co-defendant. Although Sidman's conviction was affirmed, the co-defendant had to be retried.

■ Although implied authority for a multiple jury procedure has been found under Rule 14, Fed.Rules Crim.P., 18 U.S.C., governing severance of parties and offenses, *United States v. Rowan,* supra, 518 F.2d at 690, and under state rules with similar wording, *People v. Church,* 102 Ill. App.3d 155, 163–165, 57 Ill.Dec. 679, 686–87, 429 N.E.2d 577, 584–85 (1981); *State v. Corsi,* supra, 86 N.J. at 175, 430 A.2d at 212–13, no such authority can be found in the Arizona Rules of Criminal Procedure. Specifically, our rule governing severance, Rule 13.4, Ariz.Rules Crim.P., 17 A.R.S., does not contain explicit authority for such a procedure, nor does it provide trial judges the broad discretion to "provide whatever other relief justice requires" as does the federal rule. Furthermore, our rules do not contain a provision analogous to Rule 57 of the Federal Rules of Criminal Procedure, which grants broad power to "proceed in any manner not inconsistent with these rules * * *." *Cf. United States v. Sidman,* 470 F.2d at 1170 (suggests district courts have authority to establish guidelines for multiple jury procedure under Federal Rule Crim.P. 57).

In *Hare v. Pima County Superior Ct.,* 133 Ariz. 540, 542, 652 P.2d 1387, 1389 (1982), we recently pointed out,

Following the adoption of the amended 1960 state constitution, this court was given exclusive power to make rules relative to all procedural matters in any court. Ariz. Const., art. 6, § 5, Subsec. 5, added 1960; *State v. Blazak,* 105 Ariz. 216, 462 P.2d 84 (1969). We have held that this rule-making power may not be supplemented or superseded by a Superior Court. *Anderson v. Pickrell,* 115 Ariz. 589, 566 P.2d 1335 (1977). We reenforced this constitutional position when we adopted Rule 36, Arizona Rules of Criminal Procedure, 17 A.R.S. (1973):

"Any court may make and amend rules governing its practice not inconsistent with these rules. No such rule shall become effective until approved in writing by the Supreme Court."

This rule allows adoption of local rules of practice and procedure, but only with our approval. * * *

We further stated:

* * * Nothing we say here should discourage courts, through the adoption of local rules, to carry out experiments which may improve the judicial process. Indeed, these efforts should be encouraged. But local rules must first be approved by this court * * *. *Id.* at 543, 652 P.2d at 1390.

It is clear that the "experiment" conducted in the instant case was unauthorized by this court. We thus must consider the question of prejudice to the defendant.

The authorities to date, including those cases which disapprove future use of the multiple jury procedure, are unanimous in refusing to reverse a conviction merely based on the use of this procedure, without some specific showing of prejudice. While

it has been found that this procedure involves an inherent risk that prejudicial error may occur during the trial, the procedure itself has not been found to be prejudicial. Defendant's conviction has been uniformly upheld where the courts are unable to find any specific prejudice to the defendant. *See United States v. Hays* (11th Cir.), supra; *United States v. Rimar* (6th Cir.), supra; *United States v. Rowan* (6th Cir.), supra; *United States v. Sidman* (9th Cir.), supra; *People v. Wardlow* (Cal.App.), supra; *People v. Williams* (Ill.), supra; *People v. Rainge* (Ill.App.), supra; *People v. Church* (Ill.App.), supra; *State v. Watson* (La.), supra; *Scarborough v. State* (Md. App.), supra; *People v. Brooks* (Mich.App.), supra; *State v. Corsi* (N.J.), supra; *State v. Hernandez*, 163 N.J.Super. 283, 394 A.2d 883 (App.Div.1978) (involving three juries). *See also People v. Smith*, 94 Ill.App.3d 969, 50 Ill.Dec. 296, 419 N.E.2d 404 (1981) (finds no prejudice resulted from dual jury procedure, but reverses conviction on other grounds).

Defendant in the instant case can point to no specific error occurring at trial. The trial judge was meticulous in explaining the procedure to the jurors, properly admonishing the jurors, keeping the juries separated, and keeping the juries from being exposed to inadmissible material. Defendant argues that the judge erred in giving the jurors the following explanation for the procedure:

> For some legal reasons the evidence that the State will present, some of the evidence is admissible against Mr. Smith and not against Mr. Lambright; some of the evidence is admissible against Mr. Lambright but not against Mr. Smith.

> For that reason you are one of two juries that will be chosen this afternoon.

A substantially similar instruction was given to each jury. Defendant claims this instruction may have caused improper speculation on the part of the jurors. We believe that the above explanation of the procedure was more likely to reduce rather than increase speculation by the jurors. *See also State v. Corsi*, supra, 86 N.J. at 178–179, 430 A.2d at 213 (assertion that dual jury procedure causes speculation in

the minds of the jurors rejected as a grounds for reversal). Furthermore, to the extent that through this explanation the jury became aware that there is evidence which they will not hear for legal reasons, we note that this occurs numerous times during the usual criminal trial whenever the judge sustains an evidentiary objection.

The main thrust of defendant's argument is that the dual jury procedure is inherently prejudicial, breeding confusion and speculation in the minds of the jury. We join the overwhelming authority to the contrary, however, and find that the procedure is not inherently prejudicial. In light of the severity of the penalty in this case, we have reviewed the trial record with great care. We find no reversible error in the instant case.

We do not intend the current disposition to be taken as an approval of future use of this procedure. As noted above, because this procedure is unauthorized by our rules, trial courts must obtain the approval of the Supreme Court before conducting further trials in this manner. If proposed guidelines are presented for approval, we will then consider whether they successfully minimize the risks of this procedure while maintaining the benefit of conserving judicial resources.

We note that although courts have utilized the dual jury procedure in other murder cases, *see e.g. People v. Church,* supra; *State v. Corsi,* supra, including one in which the death penalty was given and affirmed, *see People v. Williams,* supra, we feel that death penalty cases are inappropriate vehicles for experimentation with new procedures, and the practice should be avoided in the future.

## II. VENUE

Article 2, § 24 of the Arizona Constitution provides, "In criminal prosecutions, the accused shall have the right * * * to have a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed. * * * " This provision is carried into effect by A.R.S. § 13–109 which specifically provides,

§ 13–109. Place of trial

A. Criminal prosecutions shall be tried in the county in which conduct constituting *any element* of the offense or a result of such conduct occurred, unless otherwise provided by law.

B. The following special provisions apply:

1. If conduct constituting *an element* of an offense or a result constituting an element of an offense occurs in two or more counties, trial of the offense may be held in any of the counties concerned; * * *. (Emphasis added.)

█ It is clear that the actual killing in this case took place in Pinal County. The defendant argues that venue on the homicide charge was improper in Pima County, where the trial was held.

The murder charge was based on both premeditation and felony murder theories. As to felony murder, our statute provides,

§ 13–1105. First degree murder; classification

A. A person commits first degree murder if: * * *.

2. Acting either alone or with one or more other persons commits or attempts to commit sexual assault under § 13–1406, * * * [or] kidnapping under § 13–1304 * * *, and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person.

Under this felony murder theory, the underlying felonies of kidnapping and sexual assault were elements of the first degree murder charge. It is clear that the kidnapping of Sandra Owen originated in Pima County. The uncontested evidence demonstrates that Sandra Owen was abducted in the parking lot of a food stamp office in Tucson, Pima County. The only counter-argument offered is that Ms. Owen voluntarily got into the automobile when she was first picked up hitchhiking. Under our criminal code,

A person commits kidnapping by knowingly restraining another person with the intent to

\* \* \* \* \* \*

3. Inflict death, physical injury or a sexual offense on the victim, * * *. A.R.S. § 13–1304.

Further, our statutes provide that "Restraint is without consent if it is accomplished by: (a) Physical force, intimidation or deception; * * *." A.R.S. § 13–1301(2)(a). The uncontradicted evidence established that when the car reached the parking lot, Ms. Owen was not permitted to leave the car, but was forced to remain when Lambright jumped into the seat next to her, warned her to "shut up and be quiet and she wouldn't get hurt," and the car sped off with Smith at the wheel. Thus, the kidnapping began in Pima County. In addition, the evidence supports the trial judge's conclusion that the initial sexual assault, which took place while the car was in motion on Interstate 10, occurred while the defendants were still in Pima County. Because acts comprising an element of felony murder occurred in Pima County, venue was proper in Pima County under A.R.S. § 13–109, supra.

Because we have decided that venue was proper under a felony murder theory, we need not decide whether the evidence suggesting premeditation in Pima County was also sufficient to establish venue. *See State v. Poland*, 132 Ariz. 269, 275–76, 645 P.2d 784, 790–91 (1982) (evidence of premeditation in Yavapai County sufficient to support venue under A.R.S. § 13–109). *Cf. State v. Cox*, 25 Ariz.App. 328, 331–32, 543 P.2d 449, 452–53 (1975) (forming of intent did not satisfy "overt act" requirement of former venue statute A.R.S. § 13–131).

### III. VOLUNTARINESS OF STATEMENTS

Defendant Lambright was arrested at approximately 9:30 a.m. on 14 March 1981 at his place of work, Midway Auto Sales, located on Highway 62 in Orange County, Texas. The officers involved with the arrest were Thomas Latta, Assistant Chief

Deputy of the Orange County Sheriff's Department, Bruce Simpson, Captain, Deputy Sheriff of the Orange County Sheriff's Department, Winston Padgett, a detective with the Texas Department of Public Safety who had worked on the investigation, and John Hebert, a Louisiana State Police trooper who had also helped in the investigation. Lambright was properly advised of his Miranda warnings at the time of the arrest, and he indicated he understood them. He was not questioned at that time. The officers transported Lambright to the Orange County Sheriff's Office, where he was booked and then permitted to make phone calls. When he had finished his phone calls, he was interviewed beginning around 10:15 a.m. He spoke to officers Padgett and Simpson for approximately forty-five minutes, and then spoke to officer Hebert for another forty-five minutes. During this period defendant was not handcuffed, and was permitted to smoke cigarettes and drink coffee. He gave a detailed account of the crime, including his participation in it, except that he said he "couldn't remember" who actually wielded the knife.

■ The trial judge held these statements were voluntary. As we said in *State v. Arnett,* 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978), "[T]he State must show 'by a preponderance of the evidence' that the confession was freely and voluntarily made. The trial court must look to the totality of the circumstances surrounding the giving of the confession, as presented at 'voluntariness' hearings, and decide whether the State has met its burden. However, the trial court's determination of admissibility will not be upset on appeal absent clear and manifest error." (Citations omitted.) Quoted in *State v. Osbond,* 128 Ariz. 76, 78, 623 P.2d 1232, 1234 (1981). *Accord State v. Dalglish,* 131 Ariz. 133, 137, 639 P.2d 323, 327 (1982). We are unable to find any clear and manifest error in the instant case. There was nothing inherently coercive regarding these interviews, considering the time of day, duration, number of officers involved, or any other surrounding circumstances.

■ At the voluntariness hearing Lambright testified that during the drive to the sheriff's office one of the officers conspicuously displayed a gun and said that it could make a big hole in a person. This was specifically denied by each of the police officers who rode in the car with Lambright. Lambright also stated that when he was permitted to telephone his sister and his boss, he asked those persons to arrange to get him a lawyer, and Lambright believed that the officers overheard these requests. Each of the arresting officers denied overhearing any such conversation. Lambright further claimed that at the beginning of the interview he stated that he thought he should talk to an attorney. Officer Padgett, who was the first person to enter the room and began the interview, denied at trial that defendant ever made such a statement. Finally, Lambright claimed that the officers alluded to another case involving multiple defendants and stated that the first person to confess got a better deal. Each of the three officers who interviewed the defendant denied making such a reference or hearing any other officer make such a reference.

After hearing this conflicting testimony the trial judge found these statements were voluntarily given. The trial judge had an opportunity to assess directly the demeanor of the witnesses and determine their credibility. After hearing the witnesses, the trial judge was free to reject the allegations of the defendant in favor of the facts as related by the officers. We are unable to find clear and manifest error in the admission of these oral statements given to the police.

After concluding the oral statements, Lambright was asked if he would make a written statement. He agreed to do so, and was read his rights again. He had just begun to write out a statement when he was interrupted by the arrival of a judge at approximately 12:10 p.m. to secure a waiver of extradition which Lambright had indicated he was willing to give. The judge gave Lambright an additional Miranda warning, and then read him a statement regarding extradition. Lambright then

asked some complex questions regarding the extradition process. The judge responded that he could not give Lambright legal advice, and without Lambright requesting one, the judge decided to provide Lambright an attorney, and called an attorney on the telephone. After talking with the lawyer, Lambright told the judge and officers present that the attorney had told him not to make any further statements. All questioning ceased, and Lambright was transferred to the County Jail.

After extradition had been arranged, Gary Dhaemers, homicide detective with the Pima County Sheriff's Department, went to Texas in May 1981 to return Lambright to Arizona. Dhaemers told Lambright at the outset that he would not talk to him about the case because Lambright had an attorney. When they arrived in Tucson and were entering the holding area of the court building, Lambright stated to Dhaemers "I probably owe you a complete confession." The trial court properly found this spontaneous remark which was unsolicited and clearly voluntary to be admissible. We find no error in the trial court's determination of the admissibility of his statements to the police.

## IV. ASSOCIATE OF PROSECUTOR AS WITNESS

Defendant argues that the trial court erred in allowing a member of the Pima County Attorney's Office to testify. The defendant generally objected to Deputy County Attorney Paul Banales' testimony concerning Kathy Foreman's story of the crime because of "the fear that the jury will consider the testimony of a prosecutor to be more credible than that of the other witness[es]." The context of Banales' testimony here, according to the defendant, renders this fear particularly palpable. Banales testified at trial that Kathy Foreman's story never varied in its particulars before and after he granted her immunity. According to the defendant, Banales' testimony thus had a substantial impact on a key issue in the case—the credibility of the prosecution's eye witness.

The defendant did not object at trial to Banales' specific comment regarding the consistency of Foreman's story, and we do not believe that admitting the comment was error. That Foreman was an interested witness is beyond dispute; her immunity from prosecution was contingent on her testifying against the co-defendants, as the jury was advised. The credibility of a witness and the weight and value to be given her testimony are questions for the trier of fact. *State v. Spoon,* 137 Ariz. 105, 669 P.2d 83; *State v. Pieck,* 111 Ariz. 318, 529 P.2d 217 (1974). The jury would have considered the conditions under which Foreman testified, as well as Banales' comment, in deciding how much credence to give her testimony. We believe on review of the evidence that Banales' testimony had little impact on a jury that assessed first-hand the credibility of a witness subjected both to direct examination and to searching cross-examination by two defense attorneys. Moreover, the jury knew that Banales was involved in the early stages of the instant proceedings, and had made the offer of immunity. It therefore knew that the "corroboration" implicit in Banales' statement was from a source interested in the outcome of the trial. We believe, therefore, that the jury was able to place Banales' remark in context, and to accord it the appropriate weight.

As to the general contention that a prosecutor's testimony is inherently prejudicial to a defendant because of the status of the witness, we have said that the weight and credibility to be accorded to witnesses who are involved in upholding the law are jury matters. *See Baumgartner v. State,* 20 Ariz. 157, 178 P. 30 (1919); *Duff v. State,* 19 Ariz. 361, 171 P. 133 (1918). In the instant case it was not the prosecutor who was trying the case who appeared as a witness, but another person from the same office, who was not participating in the trial. The concerns we have about the county attorney also being a material witness in the crime he is prosecuting do not apply in this case. We find no error.

## V. FAILURE TO GIVE JURY INSTRUCTIONS

The next allegation of error concerns the trial court's failure to give defendant's requested jury instruction no. 10, which read:

There are two defendants. You must consider the evidence in the case as a whole. However, you must consider the charge against each defendant separately. You must not be prejudiced against one defendant simply because you determine that the State has proved its case against another defendant.

 The failure to give instructions which are not correct statements of the law or do not fit the facts of a particular case is not error. *State v. Axley,* 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982); *State v. Reinhold,* 123 Ariz. 50, 57, n. 4, 597 P.2d 532, 539, n. 4 (1979); *State v. Rhymes,* 107 Ariz. 12, 14, 480 P.2d 662, 664 (1971). The above instruction to the jury that it "must consider the charge against each defendant separately" was an incorrect statement of the law given the dual jury procedure. The trial judge correctly pointed out that each of the juries in this case were supposed to consider the charges against only one defendant, not to consider the charges against each defendant separately. This instruction was an incorrect statement of the law, had the potential for confusing the jury, and therefore was properly refused.

We also note that the trial judge correctly instructed the jurors,

The only matter before you for your decision is the guilt or innocence of the particular defendant.

"If the substance of the proposed instruction is adequately covered by instructions actually given by the court, there is no error in their being refused. *State v. Cookus,* 115 Ariz. 99, 563 P.2d 898 (1977)." *State v. Gretzler,* 126 Ariz. 60, 89, 612 P.2d 1023, 1052 (1980). *Accord State v. Melendez,* 121 Ariz. 1, 5, 588 P.2d 294, 298 (1978).

## VI. CONSTITUTIONALITY OF ARIZONA DEATH PENALTY STATUTE

 Defendant claims that the Arizona death penalty statute, A.R.S. § 13–703, is unconstitutional in that it is cruel and unusual punishment contrary to the eighth amendment. This issue has been resolved adversely to defendant's position on numerous occasions. *State v. Gretzler,* 135 Ariz. 42, 53, 659 P.2d 1, 12, cert. denied —— U.S. ——, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). *See also State v. Gillies,* 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983); *State v. Woratzeck,* 134 Ariz. 452, 456, 657 P.2d 865, 869 (1982).

## VII. VALIDITY OF STATUTORY AGGRAVATING CIRCUMSTANCE OF "HEINOUS, CRUEL OR DEPRAVED"

 Defendant also claims that the statutory aggravating circumstance prescribed by A.R.S. § 13–703(F)(6), killing in an "especially heinous, cruel, or depraved manner," is unconstitutionally vague. We have considered and rejected this claim in prior cases. *State v. Gretzler,* supra, 135 Ariz. at 50, 659 P.2d at 9. *See also State v. Jeffers,* 135 Ariz. 404, 430, 661 P.2d 1105, 1131 (1983); *State v. Zaragoza,* 135 Ariz. 63, 68, 659 P.2d 22, 27 (1983).

## VIII. RIGHT TO JURY SENTENCING

 Defendant asserts that he has a right to have a jury participate in sentencing when the death penalty is a possible outcome. This assertion has also been rejected by the court numerous times. *State v. Gretzler,* supra, 135 Ariz. at 56, 659 P.2d at 15. *See also State v. Richmond,* 136 Ariz. 312, 316, 666 P.2d 57, 61 (1983).

## IX. BURDEN OF PROOF ON MITIGATING CIRCUMSTANCES

 Defendant also argues that placing the burden of proof on defendant to prove mitigating circumstances, *see* A.R.S. § 13–703(C), violates due process. Several of our cases hold to the contrary. *State v. Richmond,* supra, 136 Ariz. at 316, 666 P.2d at 61; *State v. Blazak,* 131 Ariz. 598, 602, 643 P.2d 694, 698 (1982); *State v. Smith,* 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980).

## X. INDEPENDENT REVIEW

In every case in which the death penalty is imposed we conduct an "independent review of the facts that establish the presence or absence of aggravating and mitigating circumstances." *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (citations omitted), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1976). We further "determine for ourselves if the latter outweigh the former when we find both to be present." *Id.*

▄▄ In the instant case the trial judge found the evidence established the aggravating circumstance set out in A.R.S. § 13–703(F)(6), that the "defendant committed the offense in an especially heinous, cruel, or depraved manner." Cruelty has been specifically defined to involve the infliction of pain on the victims. We have also stated that our concept of cruelty involves not only physical pain, but also mental distress visited upon the victims. *State v. Gretzler,* supra, 135 Ariz. at 52, 659 P.2d at 11. In *State v. Tison,* 129 Ariz. 526, 633 P.2d 335 (1981), we found cruelty based on the infliction of such emotional distress. There the victims were held by armed captors for an extended period, forced at gunpoint to move from place to place, and finally compelled to witness other family members being shot to death while awaiting their own executions. In this case the victim was abducted and driven away from the city in which she was picked up by her captors. She was described as being scared and trembling as she sat in the back seat of the car. During the drive she was sexually assaulted. She was then taken to an isolated location, and placed in obvious fear for her life, as evidenced by her asking her captors if they intended to let her go. She was then sexually assaulted a second time before being killed. As was the case in *State v. Tison,* supra, we are able to find cruelty based on the "great degree of mental pain" inflicted on the victim during the course of this crime. 129 Ariz. at 543, 633 P.2d at 352.

▄▄ In addition to the mental pain involved, the manner of killing was one which was physically painful to the victim. Ms. Owen was choked and then stabbed in the chest and abdomen. The knife was twisted and turned while it was inside her. Her throat was then cut deeply. After these attacks she remained alive and was still conscious, as she raised herself up on one elbow when her assailants turned to leave. Lambright then returned and threw a large boulder down on her head. The victim, who was conscious during this series of violent attacks, must have suffered great physical pain. The statutory element of cruelty is established.

▄▄ The statutory concepts of heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions. *State v. Poland,* supra, 132 Ariz. at 285, 645 P.2d at 800; *State v. Tison,* supra, 129 Ariz. at 543, 633 P.2d at 352. The evidence also supports a finding that Lambright had a heinous and depraved attitude during this crime. In *State v. Gretzler,* supra, 135 Ariz. at 51–53, 659 P.2d at 10–12, we identified specific factors which lead to a finding that the crime was committed in a heinous and depraved manner. One of these factors is the relishing of the murder. In *State v. Clark,* 126 Ariz. 428, 437, 616 P.2d 888, 897, cert. denied 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), we found the murderer had a depraved state of mind where he "kept a spent bullet as a grisly souvenir of his crime." In the instant case, when the defendant was arrested one year after the murder he was wearing a necklace with a charm that had belonged to Ms. Owen. When the authorities inquired about the charm, Lambright told them he "kept it as a m[e]mento of the trip." A heinous and depraved state of mind is also demonstrated by Lambright's participation in the macabre celebration of the killing during which the group played the song "We Are the Champions."[1] As mitigation the defendant

---

1. Because of the strong evidence cited above reflecting Lambright's heinous and depraved attitude toward the killing, we need not also rely on Foreman's uncorroborated testimony

presents his lack of a record of prior violent crime, an honorable discharge from the military, an asserted unsettled family life as a child, and the fact that Kathy Foreman was granted immunity for her testimony, which is discussed more fully infra. While we have considered all the mitigation suggested by defendant, we do not find it sufficiently substantial to outweigh the aggravating circumstance and to call for leniency. See A.R.S. § 13–703(E). The death penalty was properly imposed in this case.

## XI. PROPORTIONALITY REVIEW

In addition to conducting an independent review of the propriety of each death sentence, we also conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." State v. Richmond, supra, 114 Ariz. at 196, 560 P.2d at 51. Accord State v. Gretzler, supra, 135 Ariz. at 58, 659 P.2d at 17.

██ Our initial inquiry is whether the disposition accorded to Kathy Foreman, who received immunity in return for her testimony against Lambright and Smith creates a disproportionate result. While a more lenient sentence received by an accomplice has been considered along with other mitigating circumstances in determining whether to impose the death penalty, see State v. Watson, 129 Ariz. 60, 628 P.2d 943 (1981) (leniency granted to accomplice together with numerous other mitigating circumstances sufficiently substantial to reduce death sentence to life imprisonment), our cases have held that the mere fact that an accomplice has received leniency does not in itself prevent the imposition of the death penalty.

██ In State v. Gillies, supra, where one defendant was tried and received the death penalty, and his accomplice plead guilty and was sentenced to life imprisonment, we noted that, "[a]ny resulting inequity between

the two sentences is a consequence induced by our plea-bargaining system." 135 Ariz. at 515, 662 P.2d at 1022. Similarly, in State v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983), in which defendant Gerlaugh was also tried and sentenced to death, it was noted that the charges against an accomplice were disposed of through a comprehensive plea agreement under which he was given life sentences on some of the charges together with a twenty-one year sentence on another charge. 135 Ariz. at 91, n. 1, 659 P.2d at 644, n. 1 (concurring opinion). More directly on point, in State v. Richmond, supra, another death penalty case, we specifically considered the fact "that both Rebecca Corella and Faith Erwin were involved in the crime but were never charged." 136 Ariz. at 320, 666 P.2d at 65. In none of the above cases did we find that the prosecutorial discretion exercised toward other participants in the crime rendered improper the particular defendant's death sentence. Although Foreman managed to escape prosecution by offering her testimony in return for immunity, we note that the other person brought to trial in this case, Robert Smith, has been given the same sentence received by Lambright. While the disposition of other persons involved in the crime is an important factor in determining the proportionality of a capital sentence, the court must also consider the propriety of the sentence in relation to the disposition of persons involved in other similar crimes.

██ Having reviewed other crimes involving the same aggravating circumstance found in the instant case, we find that the death sentence received by defendant Lambright is proportional to the disposition of the persons involved in those crimes. In State v. Jeffers, supra, State v. Bishop, 127 Ariz. 531, 622 P.2d 478 (1980), State v. Ceja, 126 Ariz. 35, 612 P.2d 491 (1980), State v. Knapp, 114 Ariz. 531, 562 P.2d 704 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), each of the defendants was convicted of a murder in which the sole

---

that Lambright stated before the crime he "would like to kill somebody just to see if he

could do it," and said "Die, bitch" as he threw the rock on the victim's head.

aggravating circumstance was that the crime was found to have been committed in an especially heinous, cruel, or depraved manner under A.R.S. § 13–703(F)(6), and each received the death penalty.

We find also that Lambright's sentence is not disproportionate to other cases in which this court has held that leniency was appropriate in light of more compelling mitigating circumstances than are present here. *See State v. McDaniel,* 136 Ariz. 188, 665 P.2d 70 (1983) (defendant did not intend to kill); *State v. Graham,* 135 Ariz. 209, 660 P.2d 460 (1983) (substantial mental impairment due to medically-induced drug addiction, neurological problems, and brain damage; vulnerability to influence; lack of prior record of violence); *State v. Valencia,* 132 Ariz. 248, 645 P.2d 239 (1982) (extreme youth of defendant—sixteen years old at the time of his crime); *State v. Watson,* 129 Ariz. 60, 628 P.2d 943 (1981) (convincing evidence of change of defendant's character and goals while in prison; youth of defendant; murder occurred as the result of a shootout begun by robbery victim); *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979) (substantial mental impairment due to brain lesion).

▮ While we believe that overall considerations of proportionality favor imposition of the death penalty in this case, we are disturbed by the treatment accorded Kathy Foreman. After viewing the evidence and hearing the testimony in this case, the trial judge concluded that Kathy Foreman was "equally guilty" with Smith and Lambright. By her own admission she assisted Smith and Lambright in restraining the victim when the car was stopped briefly, and she held one of the victim's arms while she was being stabbed. Furthermore, it does not appear the information she had to offer was unique or essential. At the time she was granted immunity Lambright and Smith were already in custody for these crimes, and each had confessed.[2] Foreman did agree to try to lead authorities to the victim's body, but each of the other participants had already demonstrated a similar willingness by drawing maps for authorities to use in their search. After reviewing the record in this case the trial court stated that the granting of complete immunity to Kathy Foreman was "appalling." We agree. We must remind prosecuting attorneys that the favorable treatment accorded to an accomplice can, under different facts, be given weight in considering the proportionality of a capital sentence.

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, and find none.

The convictions and sentences are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

FELDMAN, Justice, specially concurring.

I concur with the result and with much of the reasoning contained in the opinion. I write because I disagree with the court's conclusion that the use of dual juries was equivalent to the adoption of a local rule without sanction of this court.

This record contains no hint that the Superior Court of Pima County has adopted a general procedure to be applied in cases with "*Bruton* problems" or in similar cases where the objective of efficient and prompt administration of justice conflicts with the necessity of providing defendants with a fair trial. The record does indicate that the trial judge correctly concluded that defendant's right to a fair trial required a severance. However, he was informed that if the two cases were severed, each trial would consume approximately three weeks and that the prosecution intended to call several out-of-state witnesses. Thus, successive trials would have resulted in a disproportionate expenditure of court, witness and jury time, with the attendant expense and inconvenience.

2. We are also unable to find circumstances surrounding these confessions which would cause a prosecutor substantial concern over their admissibility.

To handle this problem, the judge decided to sever the cases but to hold both trials at once, with two separate juries in the same courtroom. As the majority correctly indicates, careful precautions were taken and neither defendant was prejudiced in any manner. I see no reason to chastise the trial judge for using the procedure, nor any ground to conclude that he made some special rule of local procedure without sanction of the supreme court. More importantly, I see no reason to inhibit other trial judges from using innovative techniques when required in a particular case in order to meet the ever-growing problems of the system.

Rule 36, Rules of Criminal Procedure, 17 A.R.S. (1973), should be interpreted to require advance consent by this court only for the adoption of "rules of court" which set standards of procedure to be aplied to all cases or to all cases of certain classes. "A rule of court prescribes a procedural course of conduct that litigants are required to follow, the failure to comply with which may deprive the parties of substantial rights." *Hare v. Superior Court*, 133 Ariz. 540, 542, 652 P.2d 1387, 1389 (1982). What we have here is not a rule of procedure for litigants; it is an order—the exercise of an individual judge's discretion to use a particular technique in order to meet a specific problem. In my view, where the trial judge innovates in accommodating the requirements of a particular case, we are dealing with a discretionary function rather than with "rule making." Trial judges have inherent power and discretion to adopt special, individualized procedures designed to promote the ends of justice in each case that comes before them. *Schavey v. Roylston*, 8 Ariz.App. 574, 575, 448 P.2d 418, 419 (1968) (Judge had inherent power to exclude spectators even though the rule permitting this had been repealed.), 20 Am. Jur.2d, Courts §§ 79 and 81. Such discretion—and thus the procedure adopted in the case at bench—is expressly recognized by Rule 611, Rules of Evidence, 17A A.R.S., which permits the trial court to "exercise reasonable control over the mode [of] ... presenting evidence so as to ... avoid needless consumption of time ...."

The court of appeals recently considered a procedure followed by a judge who allows jurors to submit questions for witnesses. *State v. LeMaster*, 137 Ariz. ——, 669 P.2d 592 (App.1983). The court approved the procedure—properly in my view—even though it applied to all cases that come before the judge in question and is, therefore, much more of a "rule" than the "one-time" procedure followed in the case at bench. It was not and has never been suggested that a trial judge must get the approval of this court before deciding whether or how to allow jury questions to witnesses. The same may be said of methods of settling jury instructions, handling motions *in limine*, conducting pretrial conferences, holding settlement discussions, regulating argument, handling objections and numerous other aspects of trial procedure. In fact, no procedure exists whereby a trial judge can obtain the opinion of this court, in advance, before using some technique which, although not prohibited, is not expressly permitted by rule.

The inherent discretion of each trial judge to control his or her own courtroom is one of the strong points of the common law. Of course, we must draw the line where a trial judge institutes procedures contrary to the rules or inconsistent with their spirit. At the same time, we must leave the trial judge free to adopt procedures and techniques for individual cases which present problems not specifically covered by the rules. I believe that this court should support such efforts and that the position taken today is a step backward.